UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Animal Protection Institute and
Center for Biological Diversity,

    Plaintiffs,

v.                                                                  MEMORANDUM OPINION
                                                                             AND ORDER
                                                                             Civil No. 06-3776 (MJD/RLE)

Mark Holsten, in his official
capacity as Commissioner of the
Minnesota Department of Natural
Resources,

    Defendant,
and

Minnesota Trappers Association, et al.,

    Defendant - Intervenors.
_____

    Marc D. Fink and John Buse Center for Biological Diversity and James J. Tutchton, Environmental Law Clinical Partnership for and on behalf of Plaintiffs.

    David P. Iverson and Nathan J. Hartshorn, Assistant Minnesota Attorney Generals for and on behalf of Defendant Mark Holsten, Commissioner of the Minnesota Department of Natural Resources..

    Gary R. Leistico, Rinke Noonan Attorneys at Law, William P. Horn and James H. Lister, Birch, Horton, Bittner & Cherot, and Laurence J. Lasoff and Barbara A. Miller, Kelly Drye & Warren for and on behalf of Defendant Intervenors.

1

Kirk A. Schnitker and Jon Morphew, for Minnesota Outdoor Heritage Alliance, Douglas S. Burdin and Anna M. Seidman for Safari Club International as Amici Curiae.
_____

In their Amended Complaint, Plaintiffs Animal Protection Institute ("API") and Center for Biological Diversity assert that Defendant Mark Holsten, in his official capacity as Commissioner of the Minnesota Department of Natural Resources ("DNR") has and is violating Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538, by authorizing and allowing trapping and snaring activities that "take" Canada Lynx, which is listed as protected under the ESA. Amended Complaint ¶ 1. Plaintiffs seek declaratory and injunctive relief to stop these ongoing violations. Id.

Before the Court are cross motions for summary judgment.

Background

API is a national, non-profit organization that is dedicated to the advocacy of the protection of animals from cruelty and exploitation. Approximately 494 API members live in Minnesota, and regularly use Minnesota land for recreational and other purposes. Plaintiff Center for Biological Diversity is a non-profit corporation with over 35,000 members that are dedicated to the

preservation, protection and restoration of biodiversity and ecosystems throughout the world.

The focus of this case is the Canada Lynx; a medium sized cat with long legs, large, well-furred paws, longs tufts on their ears and a short, black-tipped tail. The lynx's features make it highly adapted for hunting in deep snow. The lynx are highly specialized predators whose primary prey is the snowshoe hare.

The lynx habitat extends into four different regions: 1) the Northeast; 2) the Great Lakes; 3) the Southern Rocky Mountains; and 4) the Northern Rocky Mountains/Cascades. Plaintiffs Ex. B., p.2. In 1982, the U.S. Fish and Wildlife Service ("FWS") proposed listing the lynx as a threatened species under the ESA. Id. p. 3. In March 2000, the lynx was formally designated as a threatened species. Id.; 65 Fed.Reg. 16052 (March 24, 2000). Despite its designation as a threatened species entitled to protection under the ESA, there have been at least 13 reported instances of the trapping or taking of Canada Lynx in Minnesota since 2002 that have resulted in either injury or death to the subject lynx. Plaintiffs' Ex. M.

Endangered Species Act

Section 9 of the ESA prohibits any person from taking an endangered species. 16 U.S.C. § 1538 (a)(1)(B). This prohibition applies to threatened species

3

as well. 50 C.F.R. § 17.31(a). The term "take" is defined broadly, and it means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19). Furthermore, a take need not be intentional. Babbit v. Sweet Home Chapter of Communities, 515 U.S. 687, 704 (1995).

Under certain terms and conditions, the taking of a threatened or endangered species that is incidental to the purpose of otherwise lawful activity may be allowed. 16 U.S.C. § 1539 (a)(1)(B). To escape liability under ESA, however, the person[1] must have received an Incident Take Permit ("ITP"). 16 U.S.C. § 1536 (b)(4), (o)(2). As a prerequisite to receiving an ITP, the applicant must submit a habitat conservation plan that specifies "(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for

---

[1] ESA defines "person" to include an individual, and an officer, employee, agent, department or instrumentality of a State. 16 U.S.C. § 1532 (13).

purposes of the plan." 16 U.S.C. § 1539 (a)(2)(A).

In a related action filed in this District[2], the DNR agreed to file an ITP. Plaintiffs' Ex. H.  The DNR asserts that it plans to submit this permit by March 2008.[3]  Once filed, it may take up to 10 months for the FWS to process the permit. See Doc. 77 (Magistrate Erickson's Order Denying Motion for Stay).

In this action, Plaintiffs argue that the DNR is liable for the taking of lynx in Minnesota since 2002 as the DNR oversees the licensing and regulation of trapping in Minnesota.  These regulations consist of annually publishing a hunting and trapping regulations handbook.  Plaintiffs Ex. A.  As provided in the handbook, no person may trap wild animals in Minnesota without first obtaining a trapping license from the DNR.

The DNR's oversight of trapping includes the establishment of trapping seasons for certain animals; such as bobcats, fisher, and pine marten.  Minn. Stat. § 97B.605-35, Minn. R. 6234.1300-2000; Ex. A., p. 43.  The trap types most commonly used by trappers in Minnesota are: 1) "foothold" or "leghold" traps

---

[2]The Humane Society of the United States et al. v. Gene Merriam, as Commissioner of the Minnesota Dept. of Natural Resources, No. 06-2922 (D. Minn. Feb. 1, 2007).

[3]To date, the Court has not received word from the parties as to whether the DNR has in fact filed its application for at ITP.

that have a spring loaded jaw that is designed to clamp down and hold the animal by the leg or foot; 2) "killer" or "conibear" traps that are designed to kill the animal; 3) "snares" consisting of a loop, wire or cable designed to catch an animal by the foot, neck, or body, which tightens when the animal tries to free itself. Plaintiffs Ex. B, p 11-18. The DNR has established regulations with respect to the type of trap used as well. For example, a killer trap may not have a maximum jaw opening of greater than 7 ½ inches on land, and traps that are not intended to kill must be checked once every third day. Ex. A., 47-48. Certain regulations have also been promulgated regarding snares. Id. p. 50. For example, the loop of a snare may not be set higher than 16 inches above ground, and the diameter may not exceed 10 inches. Id.

Once an animal is designated as a threatened species, ESA provides that regulations should issue to provide for the conservation of such species.

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. . . .

16 U.S.C. § 1533(d). Drafts of regulations, referred to as 4(d) Rule, were circulated, but never formally adopted. Plaintiffs Ex. D.

The FWS did issue a pamphlet in 2003, entitled "HOW TO AVOID INCIDENTAL TAKE OF LYNX, While Trapping or Hunting Bobcats and other Furbearers." Plaintiff Ex. E. The pamphlet includes recommendations, such as not setting traps where lynx tracks have been identified, and was sent to approximately 1,520 Minnesota trappers in 2003. Id.; Doc. 68; Affidavit of Michael DonCarlos ¶ 10. The DNR has not incorporated these recommendations into its regulations. The DNR did, however, include a warning as to the protected status of the lynx in the DNR Hunting and Trapping Handbook. Said warning has been placed in a colored box, and it warns the reader that the Canada Lynx had been listed as a threatened animal, and that any taking, even an accidental taking, is a violation of federal law. Ex. A., p. 51.

In November 2006, the FWS formally designated critical habitat for lynx, which includes Voyaguers National Park. See 71 Fed. Reg. 66008. This determination is under reconsideration, however. Plaintiffs' Ex. K.

Plaintiffs have moved for summary judgment, seeking a declaration from this Court that the DNR has violated and remains in violation of Section 9 of ESA by authorizing trapping and snaring within the range of Canada Lynx in Minnesota. Plaintiffs also seek injunctive relief requiring the DNR to take all

action necessary to insure no further taking of Canada Lynx by trapping or snaring in Minnesota.

The DNR and Defendant-Intervenors, which consist of associations of trappers as well as individual trappers, also move for summary judgment on both liability of the DNR and as to the requested injunctive relief. For the reasons stated below, the Court will grant Plaintiffs' motion as to liability, and order further proceedings as to the requested injunctive relief.

1. Mootness

It is the DNR's position that once the ITP is issued, Plaintiffs' requests for relief will be moot. As Magistrate Erickson noted in his Order denying a stay, however, such permit will not likely be issued for another year, and Plaintiffs have a right to seek relief until such time as the permit is issued. Doc. 77, p. 14. The Court finds that the requested relief is not moot.

2. Proximate Cause

The Defendants also argue that the DNR is not liable under ESA for the incidental taking of lynx by virtue of the fact that the DNR allows trapping through proper licensing. To prove liability, the Defendants assert that Plaintiffs must show proximate cause between the DNR's action and the incidental taking

of lynx.  In support, Defendants assert that the United States Supreme Court has held that the ESA "take" prohibition and the "harm" regulations incorporate the ordinary requirements of proximate cause and foreseeability.  <u>See</u>, <u>Sweet Home</u>, 515 U.S. at 700 n. 13.  The Defendants assert that Plaintiffs cannot make such a showing because the conduct of the trappers is an independent, intervening cause that relieves the DNR of liability.

The position asserted by the Defendants is not supported by controlling case law.  First, the Court notes that the footnote in the <u>Sweet Home</u> decision relied upon by Defendants is dicta, as the issue involved in <u>Sweet Home</u> was a facial challenge to the Secretary's definition of "harm", rather than a liability determination.  <u>See</u> <u>Loggerhead Turtle v. Council of Volusia Cty, Fla.</u>, 148 F.3d 1231, 1251, n. 23 (11th Cir. 1998) (finding that the Court's discussion of proximate cause in note 13 is dictum).  Second, the <u>Sweet Home</u> decision actually lends support to the Plaintiffs' position.

In a 6-3 decision, the Supreme Court in <u>Sweet Home</u> held that the Secretary reasonably construed Congress' intent when defining the word "harm" to include habitat modification. <u>Id.</u> at 695.  In so finding, the Court rejected the respondents' argument that the regulation should be limited to direct

applications of force against a protected species. Id. at 697. The Court further determined that "the broad purposes of the ESA supported the Secretary's decision to extend protection against activities that cause the precise harms Congress enacted the statute to avoid." Id. at 698. Finally, the Court determined that as Congress authorized the Secretary to issue permits for incidental takings, "Congress understood § 9(a)(1)(B) to prohibit indirect as well as deliberate takings." Id. at 700.

Cases issued before and after the Sweet Home decision also recognize the broad purposes of ESA, and support a finding of DNR liability in this case. The Eighth Circuit has held that government agencies cause a taking under ESA if such agency authorizes activities that result in said taking. Defenders of Wildlife v. Environmental Protection Agency, 882 F.2d 1294, 1300, 1301 (8th Cir. 1989). At issue in Defenders was the registration, by the EPA, of strychnine in pesticides. Plaintiffs argued that the use of such pesticides by farmers caused the incidental taking of animals that were protected or threatened under the ESA. The plaintiffs further argued that by registering such pesticides, the EPA was liable for such taking under the ESA. The Eighth Circuit agreed. Id.

First, the record shows endangered species have eaten the strychnine bait,

> either directly or indirectly, and as a result, they have died. The district court noted that defendants did not seriously dispute these poisonings occurred. . . . Second, strychnine can be distributed only if it is registered. Consequently, the EPA's decision to register pesticides containing strychnine or to continue these registrations was critical to the resulting poisonings of endangered species. The relationship between the registration decision and the deaths of endangered species is clear. We thus conclude the EPA's registrations constituted takings of endangered species.

Id.

Similarly, the First Circuit held that the state of Massachusetts, through its licensing scheme of commercial fishing, was liable under the ESA for the incidental taking of Northern Right whales. Strahan v. Coxe, 127 F.3d 155, 163 (1st Cir. 1997) cert. denied, 525 U.S. 830 (1998). The court found that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA." Id. The state had argued that the statute was not intended to prohibit state licensure activity because such activity cannot be the proximate cause of the taking. Id. The court rejected the state's position, noting "[w]e do not believe . . . that an interpretation of 'cause' that includes the 'indirect causation' of a taking by the [state] through its licensing scheme falls without the normal boundaries." Id. See also, Seattle Audubon Society v. Sutherland, No.

06-1608MJP, 2007 WL 1577756 at*2 (W.D. Wash. May 30, 2007) (by regulating logging on private lands, the State has injected itself into a position in which it may be the proximate cause of an ESA take); Pacific Rivers Council v. Oregon Forest Indus. Council, No. 02-243-BR, 2002 WL 32356431 at *11 (D. Ore Dec. 23, 2002) (finding that state forester's authorization of logging operations that are likely to result in a take is itself a cause of a take).

Defendants argue these cases are factually distinguishable, because the courts found a direct relationship between the registration or licensing determination and the death or injury to the endangered species at issue. In this case, however, the taking of lynx occurs through the action of the trapper and "there is ample opportunity for trappers to trap while complying with the laws and recommendations from federal and state authorities." State Brief in Support of its Motion for Summary Judgment, p. 13. Thus, where government regulation leaves private parties free to act in ways that do not pose a threat to endangered and threatened species, other courts have not held the governmental agency liable. To accept this argument, this Court would have to find that the conduct of the trappers is an independent intervening cause. The record does not support such a finding, however.

An independent intervening cause "is one the operation of which is not stimulated by a situation created by the actor's conduct. An act of a human being or animal is an independent force if the situation created by the actor has not influenced the doing of the act." Restatement (Second) Torts § 441. Rather than prohibit trapping altogether, Minnesota has allowed trapping activities within its borders. In order to legally engage in trapping in Minnesota, however, one must obtain a license and follow all governmental regulations governing trapping activities. Thus, for purposes of determining proximate cause, the DNR's licensure and regulation of trapping is the "stimulus" for the trappers conduct that results in incidental takings. Accordingly, the trappers conduct is not an independent intervening cause that breaks the chain of causation between the DNR and the incidental takings of lynx.

Defendants argue the trapping regulations at issue here are analogous to the permits issued by the Coast Guard in Strahan v. Linnon, 187 F.3d 623 (Table), 1998 WL 1085817 (1st Cir. July 16, 1988). In Linnon, the court found that the "Coast Guard's issuance of Certificates of Documentation and Inspection is analogous to the licensure of automobiles and drivers." Id., at *4.

However, the liability determination depends on whether a risk of taking

exists if trappers comply with all applicable laws and regulations in place, not whether it is possible to avoid a taking if the laws and regulations are followed. This argument was addressed, and rejected by the court in <u>Coxe</u>.

> [W]hereas it is possible for a person licensed by Massachusetts to use a car in a manner that does not risk the violations of federal law . . . it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in the manner permitted by the Commonwealth **without risk** of violating the ESA by exacting a taking.

<u>Coxe</u>, 127 F.3d at 164 (emphasis added).

The evidence is undisputed that from 2002 through November 2005, there have been thirteen reported takings of lynx by traps. Plaintiffs' Ex. M. Of the thirteen, the DNR indicated in its response to Interrogatories that 10 takings involved traps that were legally set. Plaintiffs' Ex. L. Thus, despite the DNR's regulations and the setting of trapping seasons, a risk exists that a taking of lynx will occur even when traps are set pursuant to existing regulations.

The DNR also argues that Plaintiffs have put forth no evidence demonstrating that a lynx taking occurred when the trapper was following the relevant state and federal laws and regulations. This argument is misleading, however, as the DNR has not issued regulations to assist in the avoidance of lynx takings. Rather, the DNR has simply issued **recommendations.** As Plaintiffs

point out, the fact that a trapper may not have followed the discretionary, unenforceable recommendations that are included in the DNR handbook should not exempt the DNR from liability.  Trappers are not even required to read the DNR handbook on hunting and trapping.

The Court thus finds that the licensure of trapping, and the regulations concerning trap uses, are analogous to the commercial fishing operations at issue in Coxe, not the licensure of automobiles.  The Court further finds that Plaintiffs have met their burden of demonstrating that additional takes of lynx will occur in the future.  Since the lynx were designated as threatened under the ESA, the DNR has not issued new regulations implementing FWS recommendations concerning lynx and did not take steps to apply for an ITP until after litigation commenced over six years after the lynx was designated as a threatened species.  Thus, until such time as additional measures are taken, the risk remains that incidental takings of lynx will occur.

  3.  Section 6 of ESA

Defendants argue that Congress, in Section 6 of ESA, provides that ESA "shall not otherwise be construed to void any state law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to

permit or prohibit the sale of such fish or wildlife." 16 U.S.C. § 1535(f). Defendants argue that this section demonstrates Congress' intent that ESA should not be read to invalidate any state regulatory program.

Plaintiffs respond that they are not arguing that the DNR has violated ESA by failing to do more to protect Canada lynx. Rather, they are arguing that the DNR is in violation of Section 9 of ESA because its authorization of trapping within lynx habitat has resulted in the incidental taking of lynx. The differences between Section 6 and Section 9 of ESA have been resolved in Plaintiffs' favor by other courts. See Seattle Audobon Society, 2007 WL 1300964 at *8 (the fact that Congress made state participation in a regulatory program voluntary is a separate issue from whether Congress intended to make states liable when they authorize others to take endangered species.); Coxe, 127 F.3d at 164 (noting the Commonwealth was not being compelled to enforce ESA, rather, the plaintiffs sought, and the district court issued a ruling to end the Commonwealth's continuing violation of ESA).

  4. Injunctive Relief

Injunctive relief is available for a violation Section 9 of ESA. Defenders of Wildlife, 882 F.2d at 1301; Coxe, 127 F.3d at 166; 16 U.S.C. § 1540 (g)(1). Such

16

relief must be precisely tailored to remedy the precise violation of the DNR. Defenders of Wildlife v. Administrator, EPA, 688 F. Supp. 1334, 1354 (D. Minn. 1988).

Defendants argue that prospective injunctive relief is not warranted as there have been no reported incidental takings since the winter of 2005. While it is true that no takings were reported for the winter of 2006, and no data has been received concerning this past winter, the Court is not persuaded that the risk of incidental takings of lynx has disappeared. Given the fact that 13 takings have been reported since 2002, and that the DNR has not taken substantial steps to further protect lynx from takings, the Court finds it likely that additional takings may occur unless further regulations are implemented. See National Wildlife Fed. v. BNR, Inc., 23 F.3d 1508, 1512 (9th Cir. 1994).

5. Tenth Amendment

The DNR also argues that the Tenth Amendment bars the remedy that Plaintiffs seek in this case. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The DNR argues that nothing in ESA indicates that Congress intended to impose a duty upon the

states to take specific actions to assure that third parties do not take a listed species, relying on New York v. United States, 505 U.S. 144 (1992) and Printz v. United States, 521 U.S. 898 (1997).  This argument was considered, and rejected, by the First Circuit in Coxe, as the cases relied upon by the Commonwealth, which are the same cases cited by the DNR here, were distinguishable. Id. 127 F.3d at 167-170,

> The defendants' argument ignores the distinguishing facts of those cases.  First, the states in those cases were not found to be in violation of a congressional act passed pursuant to its constitutional authority.  Second, the states in those cases were directed to take positive action with respect to a particular field.  Here, the defendants are not being ordered to take positive steps with respect to advancing the goals of a federal regulatory scheme.  Rather, the court directed the defendants to find a means of bringing the Commonwealth's scheme into compliance with federal law.

Id. at 170.

This Court finds the Coxe opinion persuasive, and directly applicable in this case.  To the extent that Plaintiffs seek an order directing the DNR to bring its trapping scheme into compliance with federal law, Plaintiffs are not barred by the Tenth Amendment.

IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion for Summary Judgment [Doc. No. 80] is GRANTED. Defendant Mark Holsten, in his official capacity as Commissioner of the Minnesota Department of Natural Resources, has violated and remains in violation Section 9 of the Endangered Species Act by authorizing trapping and snaring within the range of Canada Lynx in Minnesota.

2. Plaintiffs' Motion for Injunctive Relief [Doc. No. 80] is GRANTED as follows: The DNR shall promptly take all action necessary to insure no further taking of threatened Canada Lynx by trapping or snaring activities within the core Canada Lynx ranges, including, but not limited to: applying for an incidental take permit for Canada Lynx on or before April 30, 2008 if, as of the date of this Order, such an application had not yet been made; and developing and preparing a proposal, to be submitted to the Court on or before April 30, 2008, to restrict, modify or eliminate the use the incidental taking of Canada Lynx through trapping activities in the core Canada Lynx ranges.  The Court will hold an evidentiary hearing if necessary to determine the appropriateness of said proposal.

3.  The State Defendant's Motion for Summary Judgment [Doc. No. 78] is DENIED.

4.  The Defendant-Intervenor's Motion for Summary Judgment [Doc. No. 105] is DENIED.

Date:  March 28, 2008

s / Michael J. Davis
Michael J. Davis
United States District Court

Civil No. 06-3776